## Rauch *versus* Lloyd & Hill.

The conductor of a train of railroad cars, on a railroad belonging to the state, has a right to direct all the movements of the train; and the engineers and teamsters employed, whether the motive power be furnished by the Commonwealth or not, are regarded as agencies employed by him, and are under his control.

For an injury resulting to a third person, through the negligence of any of the agencies employed in the moving or management of the cars, the conductor and his employers are responsible.

Where the conductor permitted the train to stand on the crossing of a public street, and absented himself from it, and the teamster attached the horses to it and moved it, from which the injury ensued, it was as much the act of the conductor and his employers, as if he had been present and directed it to have been done.

In such a case, the doctrine of *remote* and *proximate* causes, concerned in causing the injury, does not arise, and has no application.

The rules prescribed by the canal commissioners, the general railroad law, and public policy, are alike opposed to transporters so using railroads as to obstruct public highways and streets.

It is error, for the court below to submit to the jury, whether an obstruction of a public street was inevitable, where the evidence showed that it could have been avoided by the exercise of proper care and diligence on the part of the conductor. It is the duty of the court, in such case, to instruct the jury, as matter of law, that such obstruction is unauthorized and illegal.

Where a child of tender years attempted to pass under a train of railroad cars, negligently left standing on the crossing of a public street, by which he was injured, the owners of the cars are liable.

A child is not to be judged by the same rule as an adult, and cannot be regarded as guilty of negligence, for attempting to pass under a car, left standing across a street where he had a right to pass.

ERROR to the Common Pleas of *Blair county*.

This was an action on the case by Charles Rauch, a minor, by his father and next friend, against Lloyd & Hill.

On the 9th day of July 1855, the plaintiff, Charles Rauch, a lad of about six or seven years of age, in company with another boy of about the same age, named Myers, went from the residence of his father, who resided on Juniata street, in the borough of Hollidaysburg, to a carpenter shop, a short distance from his father's residence, for shavings. In going to the shop for shavings, it was necessary for the boys to cross the Allegheny Portage railroad, which lies. immediately in front of Juniata street, in the borough of Hollidaysburg. The plaintiff was on his way back from the carpenter shop, when, at the public crossing on the Allegheny Portage Railroad, he found the passage blocked up by a long train of railroad cars, so as to prevent him from crossing. The cars of the defendant were standing immediately on the crossing, without any conductor or other person in charge; the conductor having left the train standing on the crossing, for the purpose of eating his breakfast.

[Rauch v. Lloyd & Hill.]

The plaintiff and his companion, attempted to creep under the cars, from one side of the railroad to the other. Whilst in the attempt to cross under the cars, they were moved, and the plaintiff's legs were caught and both feet so crushed that amputation of both legs below the knees became necessary.

Patrick Hays was the conductor employed by the defendants,. and had the train brought from Jefferson to Gaysport, on the Allegheny Portage Railroad, by motive power of the Commonwealth; and from thence they descended to Hollidaysburg, by gravitation. Hays testified on the trial, that his train was impeded by another train of cars, standing on the track in front where his were stopped; but did not appear to be sustained by the other witnesses. From this point, the cars were usually hauled to the different warehouses by horse power. This was supplied and superintended by a man of the name of Archibald McFadden, who furnished the horses and hired drivers for that purpose, but by whom he was employed did not appear. Eli Green, a driver employed by McFadden, hitched the horses to the front car, and commenced moving them, the boy being under the car at the time the injury occurred for which this action is brought.

The plaintiff's counsel presented the following points :—

1. If the jury find that Patrick Hays was the agent of the defendants, and that he stopped his cars upon the crossing, or did not go back after his train stopped to see if the public crossing was clear, this is evidence of gross negligence on part of Hays, for which the defendants would be liable.

2. If the jury believe that if Patrick Hays might have procured the removal of the cars, had he exercised the proper degree of caution under the circumstances, he was guilty of such neglect of his manifest duty as to render the defendants liable in this action.

3. That Hays was guilty of gross negligence in leaving his train, without placing it in the care and keeping of some other person in his absence, and for such negligence the defendants are in law liable.

4. That Hays might have stopped his train before he got to the public crossing, as it was his duty to do so, inasmuch as he says he saw cars in front of his train, and in not doing so, he was guilty of such a degree of negligence as to render the defendants liable in this case.

The court below (TAYLOR, P. J.) charged the jury, inter alia, as follows :—

" 1. It is alleged that the cars of the defendants were unlawfully obstructing the public crossing, or highway; and that that was negligence. Assuming it to be true that they were, that would render them primâ facie responsible for any injury to others resulting directly from that obstruction; and for that only. If, for example, any one should be detained in the pursuit of his busi-

ness, by the obstruction, so as to sustain any appreciable loss or injury, he would have his right of action. But, evidently, if there had been nothing more than the obstruction of the crossing, this injury could not have occurred. If the cars had been allowed to stand there from that day to this, all the children in the vicinity might have crept under daily and every day, and no one would have been run over, and injured, as the plaintiff was. It may be said, on the other hand, if the obstruction had not been there, the accident would not have happened. But it still might have happened, without any *unlawful* obstruction. And it may be answered further, if the railroad had not been made by the Commonwealth, it could not have happened. In the case of Kelly *v.* The Pennsylvania Railroad Company, recently tried in Huntingdon, the boy injured had been sent by his father across the railroad, *for tobacco.* If the father in that case had not been addicted to the vice of using tobacco, the accident would not have happened! The truth is, when we suffer ourselves to go out after *remote* causes, we are far at sea, without helm or any guide. The *proximate* cause of this injury, it is quite clear, was the *moving* of the cars. They were put in motion at the time *by Archibald McFadden's driver;* and whether, if there was negligence in that, the defendants are responsible for it, depends upon the question whether or not he was the servant of the defendants. And, in view of the facts in this part of the case, if we have understood and stated them truly —and the jury will judge of that—on the authority of adjudged cases, bearing to this an analogy so close as to be undistinguishable in principle, we are of opinion he was not; and that he and his employer only, if any one, were responsible for the consequences of his negligence, if negligence was imputable : Laugher *v.* Pointer, 11 *Eng. C. L.* 579, and Quarman *v.* Burnett, 6 *Meeson & Welsby* 499.

" 2. It is also a material question of fact, whether, though the cars were upon the crossing, that was an *unlawful* obstruction by the defendants or their servants. The testimony of Hays, the conductor of the defendants' cars, is, that they were stopped there, in their downward course, by ' bumping' against coal cars of Mr. Miller, standing on the track below. It was the road of the Commonwealth—Mr. Miller, and every one else who chose, had the same right to have cars upon it that the defendants had; and if Hays might not and should not have stopped the cars above the crossing, or might not or should not have afterwards moved them back, so as to leave it open, of which you will judge, the obstruction could not be considered an *unlawful* obstruction, at least by the defendants. Whether it was or was not, would depend upon the question, whether it might reasonably have been avoided; and of this you will judge, if you find it necessary, in making up your verdict.

[Rauch v. Lloyd & Hill.]

" 3. But, assuming the defendants to have unlawfully obstructed this crossing, and that such obstruction was the proximate cause of the injury, the question recurs, was there concurring negligence on the part of the plaintiff? or, in other words, might it or might it not have been avoided, by the exercise of ordinary care on the part of the plaintiff?

" Upon this question, if the plaintiff had been an adult of ordinary prudence and discretion, he would clearly have no right of action. However deeply the defendants might have been in fault, their fault would not be equal to his folly. But it is contended, that the negligence, or want of ordinary care, which, concurring with the negligence or fault which is the proximate cause of the injury, would destroy the right of action, is to be judged of and determined by the jury from all the circumstances, and in view of the age and capacity of the party injured. Our view of what the rule here should be, is, that until a child has sufficient age and discretion to keep clear of danger so imminent and palpable, it should be kept under the eye and control of its parents or guardians. But admitting the law to be as contended by the plaintiff's counsel, and the weight of authority seems to sustain them, and we so instruct you, the question, as one of fact, assumes this shape: Has or has not a boy who is capable of performing an errand, sufficient intelligence and discretion to know the hazard of creeping under a train of cars liable to be started any moment? And had or had not the plaintiff such intelligence and discretion? And this you, gentlemen, will determine from the evidence, if in coming to a conclusion the case should turn upon this question.

" We have thus, gentlemen, stated to you the law, as it bears upon the different aspects in which this case may be viewed, and has been presented and discussed. It is your province to ascertain from the evidence the facts, and give it application. If the injury was caused solely by the negligence of the defendants, or their servants, as we stated to you in the outset, they are liable, and the plaintiff is entitled to recover; and you are the judges of the amount of damages which would compensate him. If, on the other hand, the injury was not caused by the negligence of the defendants or their servants, but by the servant of Archibald McFadden; or if the crossing was not unlawfully obstructed by them or their servants; or, however either or both of these questions may be viewed or determined, if in view of all the circumstances of this case, disclosed in the evidence, the plaintiff himself was chargeable with negligence or fault, your verdict should be for the defendants.

" It only remains to read and answer the points submitted by the counsel of the plaintiff."

(His Honor here read the plaintiff's points.)

" We refuse to give you this instruction; for, assuming everything

[Rauch *v.* Lloyd & Hill.]

as true which is here charged to Hays as negligence, it would not still follow, as claimed in each of these points, that the plaintiff must recover in this action.    That would still depend upon other questions.    In the second aspect in which the case has been viewed in our general charge, we have stated the bearing of what Hays did, or failed to do, or should have done, upon the question whether the crossing was unlawfully obstructed, and have referred to you the evidence upon that subject.    How the cars were manned or managed is no concern of the plaintiff, unless it tended proximately to cause the injury; nor do we hold it to be the duty of the proprietors of railroad cars, to hire hands to watch and guard the reckless or not properly cared for children of others, from creeping under them."

The jury found for the defendants.

Whereupon the plaintiff took this writ, and assigned the charge of the court below, and the answer to plaintiff's points, for error.

*McDowell* and *Banks,* for plaintiff in error.—Every principal is liable to third persons, for negligence in his agent in the course of his employment: *Story on Agency,* § 452; *Smith on Mas. & Serv.* 152; 1 *Am. L. Cases* 127.

That the cars standing on a public crossing, was an illegal obstruction, they referred to Act 20th March 1845, *Brightly's Purd.* 134; *Intern. Imp. Laws, App.* 50, § 94.

That the court erred in charging that the *proximate* cause of the injury was the moving of the cars by McFadden's driver; they referred to 1 *Saund.* 756; Lynch *v.* Nurdin, 1 *Ad. & E., N. S.* 28; *Id.* 41; 41 *Eng. C. L. Rep.* 426; Illidge *v.* Goodwin, 5 *Car. & P.* 190; Mohney *v.* Cook, 2 *Casey* 342; 4 *Bing.* 628.

*Blair* and *Hoffius,* for defendants in error.—The points submitted by the plaintiff assume that Hays, the carman of defendants, was guilty of gross negligence, and that the injury was its immediate result; and on these assumptions, ask an instruction for the plaintiff.    The answer of the court submitted to the jury, whether there was negligence, and whether the injury was its result, and in this we think the answer of the court was more favourable for the plaintiff than he had a right to expect; because—

1st. There was no evidence of negligence in Hays, but on the contrary it was clear, that he was prevented from crossing by a train of cars standing on the track; and the cars did not, therefore, stand *unnecessarily* on the track.

2d. The injury was not caused by the standing of the cars, assuming the obstruction to have been unlawful, but was the result of the cars being put in motion by the servant of McFadden.    He was hired to move them; he provided horses and teamsters who were wholly under his control, and no one but he is responsible

for injuries suffered by the motion of the cars.   This was ruled in Laugher v. Pointer, 5 *Barn. & Cress.* 548, though by a divided court.   And again by the whole court in Quarman v. Burnett, 6 *Mees. & Wels.* 6, 497.

3d.  The injury was so obviously the result of the plaintiff's imprudence in going under the cars, that the court ought in justice to have given a peremptory instruction for the defendants; yet they submitted the question to the jury to determine whether, considering the age of the plaintiff and the circumstances attending the occurrence, he was guilty of imprudence.   That this instruction was too favourable for the plaintiff, we refer to Pennsylania Railroad Company v. Aspell, 11 *Harris* 147; Hartfield v. Roper, 21 *Wend.* 615; Railroad Company v. Patchin, 16 *Ill.* 198; Munger v. Tonawanda Railroad Company, 4 *Comst.* 359; Willets v. Buffalo and Rochester Railroad Company, 14 *Barb.* 585; Herring v. Wilm. and Raleigh Railroad Company, 10 *Iredell* 402.

The opinion of the court was delivered by

WOODWARD, J.—The plaintiff is a minor, who sues for an injury which he alleges was caused by the negligence of the servants of the defendants.   On the morning of the 9th of July 1855, when he was about six or seven years of age, he was sent by his father, who resides on Juniata street, in Hollidaysburg, to a carpenter's shop in the neighbourhood, for a basket of shavings.   He was accompanied by another small boy.   It was necessary for the boys to cross the Allegheny Portage Railroad, which they did by the public crossing.   On their return, they found this passage blocked up by a train of railroad cars.   There were twelve or thirteen cars in the train, the hindmost, or the next to the hindmost car being on the crossing, and immediately behind this train there was a train of empty coal cars.   The boys attempted to pass under the car that stood on the crossing, and whilst in the act of doing so, Green, who was McFadden's driver, having hitched horses to the foremost car, started the train, and the wheels of one or more of the cars passed over both of the feet of the plaintiff, crushing them in such manner that to save his life both legs had to be amputated.

The defendants, whom he sues for damages, are transporters on that railroad, having a warehouse at Hollidaysburg, and were the owners of the cars, and the lumber with which they were laden. Their agent or conductor, Patrick Hays, had brought the train to that point, had stopped them where the boys found them, and had gone to his breakfast, leaving them for half an hour with nobody in charge.   It seems, that the general usage of the road is, for cars to run down from Gaysport to the vicinity of the warehouses by their own gravity, and that they are hauled from where they stop to the proper warehouse by horses.   McFadden keeps horses for

[Rauch *v*. Lloyd & Hill.]

this purpose, and serves not only .these defendants, but all the transporters at Hollidaysburg.

This is a brief outline of the material facts of the case.

The instructions which the learned court gave to the jury, may be summed up under three heads as follows :—

1st. Assuming it to be true, that the cars were unlawfully obstructing the public crossing or highway, that was not the direct or immediate cause of the injury, but the moving of the cars by McFadden's driver was the proximate cause ; and that McFadden and his .driver were not the agents of the defendants, for whose negligence the defendants would be responsible.

2d. That it was a question of fact whether, though the cars were upon the crossing, they were an *unlawful* obstruction by the defendants or their servants.   This would depend upon the question whether it might reasonably have been avoided.

3d. But, assuming the defendants to have unlawfully obstructed the crossing, and that such obstruction was the proximate cause of the injury, the question recurred, was there concurring negligence on the part of the plaintiff—or in other words, might it not have been avoided by the exercise of ordinary care by the plaintiff ?

On this head the learned judge, with an intimation of his own opinion the other way, recognised the position of the plaintiff's counsel—that the negligence or want of ordinary care of plaintiff, which, concurring with the negligence of the defendants, would destroy the right of action, was to be judged of from all the circumstances, and in view of the age and capacity of the party injured—and then restated the question in these words : " Has or has not a boy, who is capable of performing an errand, sufficient intelligence and discretion to know the hazard of creeping under a train of cars liable to be started any moment ?   And had or had not the plaintiff such intelligence and discretion ?   And this you, gentlemen, will determine from the evidence, if in coming to a conclusion the case should turn upon this question."

The plaintiff had small chance of a verdict under these instructions.   Indeed, the cause was decided against him upon the first head, for if McFadden and his driver were not defendants' agents, and yet were the authors of the proximate cause of the injury, the action should manifestly have been against them, and would not lie against the defendants.

The conclusiveness of the charge against the plaintiff is no objection to it, if it was right in point of law.   Whether it was so or not is the question to be considered upon the errors assigned ; and in considering it, I will observe the same order of arrangement the court below did.

1st. The distinction taken by the learned judge betwixt *causa proxima* and *causa remota*, correct enough as an abstract defini-

[Rauch v. Lloyd & Hill.]

tion of law, strikes us as wholly inapplicable to the circumstances of this case.

The defendants were transporters on a public highway. That highway belonged to the state, and was governed by the canal commissioners, who had authority to employ all the motive power of the road, and to prescribe rules and regulations in respect to all the business of the road.

As the cause was tried, or, at least, as it is presented on our paper-books, McFadden's relation to the road is nowhere explained; but, in the absence of special information on the point, we will presume that he was the contractor, with the canal commissioners, for the supply of animal power on that part of the Portage Railroad, in pursuance of the Act of 27th February 1835. If so, he was the state's agent, engaged in serving transporters with the removal of their cars, from point to point, as their business and convenience demanded.

Whoever will look through the "Railway Rules and Regulations," prescribed by the canal commissioners, and to be found in the appendix of the volume entitled, "Internal Improvement Laws," will see that every car on the road, belonging to private individuals, is to be attended, at all times, by the owner or conductor. The owner or conductor is to submit every car for inspection and weight—is to have its number and weight painted on the side—is to register it—is to obtain a collector's clearance for every trip; "and when the owner or conductor has more than one car under his charge," says section 63, "the collector may include the whole train in the same clearance." Throughout the great variety of minute regulations with which this code abounds, the owner or conductor is contemplated as the ever-present party, in charge of the car or the train. Sometimes the cars are propelled by steam, sometimes by gravitation, sometimes by horsepower; but everywhere, and at all times, the owner or conductor attends them, and determines the times and places of starting and stopping, and the rates of speed. He is under certain legal restraints on all these subjects; but everybody else, concerned in the transportation of his train, is under his authority.

Such, in substance, is the mode in which incorporated companies also regulate the business on their railroads. And where there are no prescript rules, the usage or common law of railroads makes the conductor the responsible agent in the conduct of the train. It is of the last importance to all interests, both public and private, that the law should define, with precision, to whom the custody and responsibility of a train of cars attaches. We hold that, from the beginning to the end of the trip, whatever the motive power employed, the conductor, and nobody else, is the responsible party in possession of the train. To him the law looks for a strict observance of all the rules and usages of the road, and

for a safe conduct of persons and property intrusted to his charge. The engineer is occupied with his peculiar duties, the brakesman with his, and the teamster with his; but the conductor is the supervisor, director, and governor of the whole. The entire trip is one thing. The clearance he obtains when he starts he surrenders when the trip is completed. To accomplish it he employs the various agencies that are provided for him at the appropriate places; but, for the purposes of the trip, they become his agencies, as was very expressly ruled in Peters *v.* Rylands, 8 *Harris* 502. Not that he makes a contract with each engineer and teamster every trip, but he employs them in pursuance of a general and systematized arrangement of the business of the road; the ultimate responsibility, all the while, resting on him, and, through him, on the owners and proprietors whose servant he is.

This view of the office of conductor, founded, as it is, in both the *lex scripta* and the *lex non scripta* of the road, brings out its importance and high responsibility; and shows that he ought to be carefully selected with special regard to the complicated, responsible and difficult trust he has to perform. But it shows, also, that he is not to be permitted to shuffle off, on to irresponsible shoulders, the consequences of his mismanagement of a train of cars. When a party has been injured by such a cause, we are not to split up the mismanagement into proximate and remote causes, and, placing only the latter to the account of the conductor, charge the former to engineers and muleteers.

The maxim, "*causa proxima non remota spectatur*," older than the common law itself, and very much older than the railroad era in which we live, is, like most of the maxims of the law, when properly applied, the ultimate conclusion of sound reason; but to apply it to a case circumstanced like the present, would be warranted by no precedent, and would be subversive of that wholesome accountability, to which the law holds those who use railroads for their own profit.

So far as concerned this plaintiff, the causes of his injury were not separable. They constituted together a mismanagement of the train; and that was one thing, the responsibility of which the law lays on the conductor and his employers. The hitching of the horses by Green (McFadden's driver), and the starting of the cars at that unpropitious moment, was as much the act of the conductor, in pursuit of his appropriate business and for the benefit of his employers, as if he had stood by and expressly ordered it. If he was not actually present to see that it was done properly, he should have been. The cars were still in his legal possession, the trip not being completed. The breakfast was no excuse for his absence, no substitute being left in charge of the train. His powers and duties in respect to it were continuing and exclusive.

The stopping of the train was no more truly his act than the

[Rauch v. Lloyd & Hill.]

starting it. McFadden's horses, on which, if we indulge in refinements, the responsibility of the proximate cause will at last fall, were not, in point of law, more completely under the control of Green, than both horses and Green, and all others concerned in the transportation, were under the control of Hays, the accredited agent of the defendants.

Now, then, I am prepared to ask, if the same party is responsible for both causes—the proximate as well as the remote—what practical virtue is there in the distinction? Why take such a distinction? What if it be founded in an ancient legal maxim, and what if, by a very sharp definition, we can call the stopping of the cars the remote cause of the plaintiff's injury, and the starting them the proximate, all this avails nothing when we come to deal with the case, in view of its appropriate principles of law and of business; for then, we see instantly, that the conductor's liability is not to be measured by any such distinction.

But again, the nature of the business, and the rules and usages of the road under which it was transacted, show incontestably that there were no two causes concerned in injuring the plaintiff, but only one. Hays undertook to conduct the defendants' train from the starting point to their storehouse—he had a right to cross intersecting highways, but not so as to injure people lawfully travelling them. He executed his duty so negligently as to injure the plaintiff.

Now, what law or logic justifies us in calling that one simple cause, two? If we should resolve the conductor's act into all its original elements, there would be many indeed; but the law does not deal with human conduct by such analyses, else it would hold the parent and schoolmaster responsible for the bad qualities of the thief or the murderer.

The truth is, the distinction upon which the court ruled this part of the case has no applicability to it—is merely fanciful, and tended only to embarrass the administration of justice. If the cars were wrongly moved by Green, it was because Hays was wrongly absent from them; and when the plaintiff complains of the original wrong, the secondary or consequential wrong is no answer to his complaint: 2 *Casey* 116.

It follows, from this view of the case, that the learned judge was in error also when he decided that McFadden and his driver were not the agents of the defendants. But, if the view we have taken were not to prevail, and the question was simply upon the agency of McFadden and his driver, the doctrine of the two English cases relied on by the learned judge would not apply. These cases, Laugher v. Pointer, 5 *Barn. & Cresswell* 547, and Quarman v. Burnett, 6 *Meeson & Welsby* 499, and a great number of other cases which followed them, established the pro-

[Rauch *v.* Lloyd & Hill.]

position, that where a stable keeper furnishes horses and a driver for a private carriage, he is liable to third persons for the misconduct of the driver, and the owner of the carriage is not liable.

Now, not to insist upon the generic difference which exists between such particular and occasional contracts on the one hand, and the complicated but systematized and constant business of a great railroad on the other, a difference palpable enough to make us cautious in reasoning from the one to the other,—there is one decisive circumstance that must always set aside such authorities in a case like the present.

I allude to the fact that the owner of the carriage, who contracts with the stable man, has no authority to manage the horses. He indicates the journey or the drive to be performed, and places himself in the carriage, leaving the execution of the job to the driver who has been furnished. If he should put his agent or conductor on the box with the driver, with authority to control him, and to supervise the entire trip, nobody, I think, would doubt the liability of the owner of the carriage for the conduct of the driver. Baron PARKE, who delivered the opinion of the Exchequer Court, in Quarman *v.* Burnett, would certainly not doubt on the point, for his observations show how very much the absence of all control over the horses on the part of the hirers weighed with him in treating the driver as the exclusive agent of the lender.

Does not that circumstance completely distinguish the adjudged cases from the present one ?

If I contract to perform a work, and send my servant to execute it, undoubtedly he is my agent; but, if I let my servant to work under the directions of your servant, he is, *quoad hoc*, your agent and not mine. This is horn book law.

Suppose the defendants had been sued as common carriers, for an injury done to the goods in their cars, after McFadden's horses were attached, would any lawyer or judge turn the plaintiff round to his action against McFadden? This question has been often settled, and always against the carrier, on our public improvements, and on connecting lines of transportation. See the cases cited in Peters *v.* Rylands, 8 *Harris* 497.

We are in the habit of saying in such cases that the carriage over the entire route is one thing, and that his contract makes the carrier responsible for all subordinate agencies. Nor is this a principle peculiar to carriers. On the contrary, it is a general rule in the law of agency, that an authority is to be so construed as to include all necessary and usual means of executing it with effect: *Paley on Agency* 189.

On this ground it is, that Hays, intrusted with the conduct of defendants' cars, was authorized to permit McFadden's horses to be attached, and on which the subordinate as well as the principal agency represented the defendants. Both were employed in their

[Rauch v. Lloyd & Hill.]

service, for their benefit, and according to the usages of the road. For the neglects of both, therefore, of one as well as of the other, they are responsible: Story on Agency, § 452.

Before leaving this branch of the cause, it is proper to notice two recent decisions of our own, which have been thought to have a material bearing in favour of the ruling below, although the learned judge of the Common Pleas did not cite or rely on them.

Morrison v. Davis & Co., 8 Harris 171, was an action of assumpsit against the defendants as common carriers, and was founded on a contract to carry the plaintiff's goods safely from Philadelphia to Pittsburgh.

The defence was that the injury was caused by the act of God, in causing a sudden and extraordinary flood in the Juniata.

To this the plaintiff replied that, if defendants had not employed a lame horse to tow their boat, they would have been beyond the point of danger when the flood came, and we decided that this was not a sufficient replication to the defendants' plea.

The doctrine of that case is, that an act of God excuses a common carrier, notwithstanding he might possibly have escaped its consequences if he had employed a sound instead of a lame horse.

How that doctrine is to be adjusted, without undue wrenching, to the circumstances of this case, I confess my inability to see.

The maxim of causa proxima is very well discussed by the learned judge who delivered the opinion, but the application of it was not to the cause of action, but to the replication made to the defendants' plea. Here, in this case, if the maxim is applied at all, it must be to the cause of action; and for the reasons given above we cannot consent to such an application. I have only to add that Morrison v. Davis should be read in connection with that part of the opinion in Pittsburgh v. Grier, which is found in 10 Harris, on pages 65, and the following. The other case is Mohney v. Cook, 2 Casey 342. The defendant had built a dam in Redbank creek, a public highway, which obstructed the navigation. The boat of the plaintiffs, laden with pig metal, was wrecked on the dam, and for the property lost they brought this action on the case against the owner of the dam. His defence was that the plaintiffs were navigating the stream on Sunday in violation of the statute.

But we overruled this defence, and held that though the plaintiffs may have been descending the stream unlawfully on the Lord's day, they were entitled to damages on account of the nuisance erected in the stream by the defendant.

Apply that doctrine to the case before us. These defendants obstructed a highway—the plaintiff, in passing along that highway, was injured by the nuisance the defendants placed there; but then this plaintiff was lawfully on his highway. That makes his case

stronger than the case of the plaintiffs in Mohney *v*. Cook. In other words, the doctrine of that case goes a good way further than a reversal of this judgment requires that we go.

2d. We pass now to the second head of the court's rulings. Were the cars unlawfully on the public crossing? Undoubtedly they were, because no authority is shown for their standing there. The 94th rule of the canal commissioners forbids any car to be unnecessarily stopped or left standing on either of the main tracks of the railway, and of course a violation of this rule which also obstructed an intersecting highway was unlawful. The general railroad law forbids incorporated companies to obstruct highways, and the policy of the law is equally opposed to transporters so using state works as to obstruct streets and roads.

What the court meant by submitting this question to the jury was, that they should inquire whether the obstruction was inevitable; but the evidence does not seem to justify such an inquiry. The conductor thinks there were cars on the track that hindered his going any further; but other witnesses deny this, whilst no one speaks of other cars being hauled away before Green hitched to this train. If there were cars on the track, they were in full sight of Hays, and he might have stopped above the crossing, or, what is a very simple arrangement for such occasions, he might have separated his train, leaving some cars above and some below the crossing.

We see nothing in the case to justify him in leaving the cars where he did, and for the time he did. And we think the court should have declared the obstruction unlawful, instead of submitting it as a question of fact to the jury.

3d. The third and final subject of consideration relates to the instruction touching the negligence of the plaintiff. I quite agree with the learned judge, that if the plaintiff had been an adult of ordinary prudence and discretion, he would have no right of action; for, however blameworthy the defendants may have been in leaving their cars on the crossing, common prudence would have restrained him from attempting to pass under them, and an adult would be bound to use common prudence.

But, that the same rule should not be applied to a child of tender years, was so successfully demonstrated by Lord DENMAN, in Lynch *v*. Nurdin, 6 *Ad. & E.* 30, and 41 *Eng. Com. L. R.* 422, and by Ch. J. REDFIELD, in Robinson *v*. Cone, 22 *Vermont R.* 224, that I shall content myself with referring to their reasonings. Nor am I unmindful of the counter current of authorities in New York, 21 *Wend.* 615, 6 *Hill* 592, 4 *Comstock* 359; but the preponderance of both reason and authority will be found favourable to the two adjudications first named.

That every case is to be determined by its own circumstances, and that children are to be held responsible only for the discretion

[Rauch v. Lloyd & Hill.]

of children, seem self-evident propositions. A blind man is not bound to see, a deaf man to hear, nor a lunatic to reason; and yet they have a right to redress for injuries inflicted by the negligence of others. Children of tender age are not responsible to the law either criminally or civilly; and that for want of discretion. Of what imprudence was this little boy guilty?

Living beside the railroad he had become familiar with cars, and had probably lost much of that instinctive dread with which they are regarded at first. Returning from his errand and finding his road blocked up by cars, which being high freight cars, would admit of easy passage under them, he probably did not stop an instant to reason on the danger. And if he did, the degree of danger would be as likely to attract as to repel him. With another case from Huntingdon county before us at this moment, where a boy under similar circumstances passed under instead of going around a train of cars, it is impossible for us to consider such conduct unnatural. If he had gone out of his track to place himself under the cars, it might be accounted rashness even in a child; but pursuing his highway, he may well have supposed that the men who placed the cars there expected him to pass under them. Considering his age, and all the circumstances of the case, we see nothing that would justify the imputation of negligence or imprudence. He acted like a child, and he is not to be judged as a man.

In answer to this view it is asked with some concern, are transporters by railroad to be responsible for all the irrational animals that may get under their cars? Certainly not. If sheep, or hogs, or children, incapable of reasoning, are permitted to wander in forbidden places, we say not that railroad managers are bound to protect them; but, if they are where they have a right to be, as on a public highway, and are injured by the fault of those in charge of trains, the liability is clear. The strength of the plaintiff's case is, that he had a right to pass along the highway, and the defendants had no right to obstruct it. He was in the exercise of a right, in a manner not unreasonable or imprudent for a child, and they injured him by reason of having stopped where they had no right to stop.

This makes his title clear to damages, of the measure of which we say nothing, as no question was raised on that subject.

Judgment reversed, and a *venire facias de novo* awarded.

LOWRIE, C. J., and STRONG, J., dissented.